IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

YVETTE LINDA SPRIGGS          *
                              *
          v.                  *          Civil No. JFM-01-0280
                              *
PUBLIC SERVICE COMMISSION     *
     OF MARYLAND              *
                          *****

**MEMORANDUM**

Plaintiff Yvette Linda Spriggs, a former auditor for the Public Service Commission of Maryland ("the Commission"), has brought an action alleging employment discrimination by the Commission in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. The Commission has moved for summary judgment. The motion will be granted.

I.

Spriggs was hired in December 1987 by the Commission, an independent state agency that regulates public service companies and utilities throughout Maryland. She began her employment as an Accountant Auditor II in the Commission's Accounting Investigations Division and received a series of promotions and pay increases during the next 13 years, culminating in her promotion to Public Utility Auditor-Senior in 1997. On May 5, 2000, the Commission transferred Spriggs to its Telecommunications Division. She worked there until her resignation in February 2001.

Count I of Spriggs' complaint alleges that she was subjected to disparate treatment during her tenure in the Accounting Investigations Division. Spriggs, who is African American, contends that she was treated less favorably than her co-workers because of her race and sex.

1

Specifically, Spriggs complains that Martha Darling Sparks, a white female hired by the division in October 1996, was promoted to Public Utility Auditor-Senior in July 1997, four months before Spriggs was promoted to this position. Spriggs alleges that this was discriminatory. She also alleges disparate treatment as to working conditions and disciplinary actions.

In Count II of her complaint, Spriggs contends that she was retaliated against for filing a charge of discrimination with the Maryland Commission on Human Relations ("MCHR") on March 31, 1998 that complained of disparate treatment in promotions. The retaliation, she alleges, included unfair reprimands and disciplinary actions and lowered performance evaluations. She filed a second charge of discrimination with the MCHR on December 9, 1999, alleging retaliation.

II.

To establish a claim under Title VII, a plaintiff must offer direct evidence of discriminatory intent on the part of the defendant or meet a three-part test set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), for the inference of discriminatory intent. Because plaintiff has not offered direct evidence of discriminatory intent by the Commission, her Title VII claims of disparate treatment and retaliation will be evaluated within the McDonnell Douglas framework.

A.

1.

The first step in the McDonnell Douglas analysis is for plaintiff to establish a prima facie case. See Settle v. Baltimore County, 34 F. Supp.2d 969, 990-91 (D. Md. 1999). A prima facie

case of disparate treatment[1] consists of four elements: plaintiff is a member of a protected class, she was qualified for the job and performed it satisfactorily, she suffered an adverse employment action, and she was treated differently from similarly situated employees. See Qualls v. Giant Food, Inc., 2002 WL 246578, at *2 (D. Md. 2002); Nichols v. Caroline County Bd. of Educ., 123 F. Supp.2d 320, 325 (D. Md. 2000). Plaintiff has satisfied the first two elements of a prima facie case. As an African American, she is a member of a protected class. Further, defendant has not challenged the fact that plaintiff was qualified for her job.[2] However, plaintiff has failed to establish a prima facie case of disparate treatment as to either working conditions or disciplinary actions[3] because she has not demonstrated that she suffered an adverse employment action.

---

[1]Count I of plaintiff's complaint asserts that she was discriminated against because she was "subject[ed] to working conditions that white male employees were not subjected to." (Compl. ¶ 16.) However, because the fact section of her complaint also alleges "disparate treatment with regard to promotions . . . and disciplinary actions" (id. ¶ 7), and because plaintiff focuses her response to this motion on promotions, I will address disparate treatment as to all three areas: working conditions, discipline, and promotions.

[2]Despite evidence of a difficult relationship with her supervisors, plaintiff was promoted four times during her tenure at the Commission and received numerous salary increases. (See Def.'s Reply Ex. A Attach. 1.)

[3]Disparate discipline is a "species of disparate treatment." Settle, 34 F. Supp.2d at 991. The elements of a disparate discipline claim parallel the requirements of a disparate treatment claim. As with all employment discrimination claims, the law requires as "'an absolute precondition to suit that some adverse employment action have occurred.'" Id. at 987 (quoting Bristow v. Daily Press, Inc., 770 F.2d 1251, 1255 (4th Cir. 1985)). Additionally, similar to the disparate treatment requirement that a plaintiff show she was treated differently from similarly situated employees, the test for disparate discipline requires that the plaintiff demonstrate that "disciplinary measures enforced against him were more severe than those enforced against other employees." Id. at 991.

In her deposition, plaintiff cited numerous examples of working conditions that she considered to be discriminatory.[4] These included the removal of the lock from her office door while she worked in the Accounting Investigations Division[5] and her placement in objectionable offices after her transfer to the Telecommunications Division.[6] (Spriggs Dep. at 48.) As the Fourth Circuit explained in Von Gunten v. State of Maryland, 243 F.3d 858 (4th Cir. 2001), plaintiffs in Title VII cases must establish "that the challenged discriminatory acts or harassment adversely effected 'the terms, conditions, or benefits' of the plaintiff's employment." Id. at 865 (quoting Munday v. Waste Mgmt. of North America, Inc., 126 F.3d 239, 243 (4th Cir. 1997)). Plaintiff alleges, at best, only displeasure and inconvenience as a result of the changing of her office lock and her office assignments. An action that merely causes an employee irritation or inconvenience, but does not affect a term, condition, or benefit of her employment, is not an adverse employment action. See id. at 869; Tuggle-Owens v. Shalala, 2000 WL 783071, at *8 (D. Md. 2000).

The allegedly disparate discipline of which plaintiff complains occurred primarily in November 1999. The plaintiff's supervisor, Randy M. Allen, who had been hired in August

---

[4]See infra note 16 for additional items cited by plaintiff.

[5]The key lock was apparently removed so managers would have access to the plaintiff's office when she was away. (See Def.'s Mem. Ex. I.) It was replaced with a different kind of lock. (See id.)

[6]Plaintiff alleges that upon her transfer to the Telecommunications Division, she was assigned to an office that contained "little green bugs." (Spriggs Dep. at 117.) The defendant called an exterminator and eventually moved her to another office. (See id. at 118-19.) Plaintiff complains that the second office to which she was assigned was too hot during the afternoons, rising to temperatures of 90 to 100 degrees. (See id. at 119.)

4

1999 to direct the division, first recommended that the plaintiff receive a written reprimand for failing to abide by an "open door" policy. (See Def.'s Mem. Ex. I.) The Commission's Appointing Authority,[7] Felecia L. Greer, denied the request, finding it was not clear that Spriggs had "flatly refused" to obey the policy. (Id.) At approximately the same time, Allen required Spriggs to provide medical documentation for each separate use of sick leave and recommended that, because of Spriggs' use of sick leave on 17 occasions in a 12-month period, she should be evaluated by the State Medical Director. (See Def.'s Mem. Ex. L.) Greer found that the medical evaluation was not necessary because Spriggs had not reported having a disability. (See id.) Although Greer initially approved Allen's placement of Spriggs on the "one-day sick slip" procedure, she reversed the requirement three months later during a grievance proceeding after finding that Spriggs was entitled to be counseled first about her use of sick leave.[8] (See id.; Def.'s Mem. Ex. O.) Allen next recommended that Spriggs be fired for "willful inability to perform critical duties," falsification of time and attendance records, and insubordination. (Def.'s Mem. Ex. J.) Greer determined that Spriggs should be demoted to Public Utility Auditor

---

[7]The Appointing Authority is an individual charged by statute with the power to make state government appointments, terminate state employees' jobs, or take disciplinary action against state employees who have engaged in misconduct. See Md. Code Ann., State Pers. & Pens. §§ 1-101(b), 11-104. The Appointing Authority may take disciplinary action only after investigating the situation, meeting with the employee, and considering mitigating circumstances. See Md. Code Ann., State Pers. & Pens. § 11-106(a).

[8]It is not clear whether Spriggs was required to follow the "one-day sick slip" procedure during the period between November 1999, when Allen implemented it, and February 2000, when Greer reversed the requirement, because it is not clear whether Spriggs took sick leave during this time period. Earlier in 1999, Spriggs had challenged a "one-day sick slip" requirement imposed on her by a different manager, David L. Valcarenghi, and that requirement was rescinded before it was implemented. The latter disciplinary effort is discussed supra in section II.B.

instead, and the Commission's Chairman affirmed. (See id.; Def.'s Mem. Ex. M.) Spriggs

appealed to an administrative law judge, who reversed the demotion and awarded her full back

pay because the demotion had not been imposed within the time limits prescribed by state

statute. (See Def.'s Mem. Ex. Q.) Documents relating to the above attempted disciplinary

measures were removed from plaintiff's personnel file when she was transferred to the

Telecommunications Division. (See Def.'s Mem. at 8 n.3.)

While disciplinary actions and reprimands could constitute adverse employment actions,

all of the actions above were supervisory recommendations that were either never taken (in the

case of the requested reprimand, firing, and referral to the State Medical Director) or that were

reversed or rescinded (in the case of the demotion and "one-day sick slip" procedure). Further,

Plaintiff has offered no evidence that her manager's requests ever affected a term, condition, or

benefit of her employment. These reversed or rescinded actions thus cannot form the basis for

vicarious liability under the employment discrimination laws. See Dennis v. County of Fairfax,

55 F.3d 151, 156 (4th Cir. 1995); cf. Howze v. Virginia Polytechnic & State Univ., 901 F. Supp.

1091, 1096 (W.D. Va. 1995) (finding decision not to promote, which was reversed on

administrative appeal, did not constitute an adverse employment action).

Even if the claims discussed above were found to constitute adverse employment actions,

plaintiff has not offered evidence that any other employee was treated differently with respect to

discipline or working conditions than she was. See, e.g., Karpel v. Inova Health Sys. Servs., 134

F.3d 1222, 1228 (4th Cir. 1998) (refusing to find discriminatory intent where defendant's alleged

attempts to "build up a file" on plaintiff were not shown to be racially motivated or different

6

from how similarly situated employees were treated).  As a result, plaintiff has not established a

prima facie case of disparate treatment based on working conditions or disciplinary actions.

2.

Plaintiff also alleges disparate treatment in promotions because a less senior white

woman was promoted before she was.[9]  Even assuming this claim is adequate to establish a

prima facie case of disparate treatment,[10] defendant has offered a legitimate, nondiscriminatory

reason for its actions that plaintiff has not established to be a pretext for race discrimination.  See

McDonnell Douglas, 411 U.S. at 802; Settle, 34 F. Supp.2d at 991.

The basic facts regarding the promotion of Sparks before plaintiff are not in dispute.  The

Commission hired Sparks in October 1996 as a Public Utility Auditor, a job classification to

which the plaintiff had been promoted in 1994.  (See Def.'s Reply Ex. A Attachs. 1-2.)  Sparks

was hired at a starting salary of $34,960, compared to the plaintiff's salary at that time of

$38,556.  (See id.)  In July 1997, Sparks was promoted to Public Utility Auditor-Senior and her

annual pay was increased to $39,933.  (See Def.'s Reply Ex. A Attach. 2.)  Four months later, in

---

[9]The claim cannot be categorized as one of failure to promote, for the plaintiff did receive the promotion in question, albeit not as soon as she believed was merited.

[10]Some cases cast doubt on whether a plaintiff can prove a prima facie case of race discrimination case by offering only one example of a white employee who was treated more favorably than was the plaintiff.  See, e.g., Middleton v. Frito-Lay, Inc., 68 F. Supp.2d 665, 670 (D. Md. 1999) (finding that "the fact that one white employee received favorable treatment is not enough to prove a racial bias on the part of [an] employer").  However, because plaintiff worked in a small division, consisting of only four auditors (see Def.'s Mem. at 1 n.1), and because employment discrimination cases necessarily are fact-bound and not amenable to a mechanical resolution, see Cook v. CSX Transp. Corp., 988 F.2d 507, 512 (4th Cir. 1993), I will assume arguendo that a single example is adequate in this context.

November 1997, the plaintiff was promoted to Public Utility Auditor-Senior and her salary was increased to $41,546. (See Def.'s Reply Ex. A Attach. 1.)

According to the defendant, Sparks was promoted quickly because of her "more than satisfactory performance" and defendant's desire to compensate Sparks for the pay decrease she took in moving from private to public sector employment. (See Kruft Aff. ¶¶ 13-14.) Plaintiff was not promoted earlier, according to the defendant, because of "the poor quality of her work" and her hostile and uncooperative attitude. (See id. ¶ 8.) The director of the Accounting Investigations Division, Charles J. Kruft, stated in an affidavit that the plaintiff "showed a disinterest in her work over time. She developed a pattern of not getting things done, or not getting things done in a timely manner." (Id. ¶ 15.) Despite this, Kruft stated, the plaintiff did good work on one case and therefore was promoted to Public Utility Auditor-Senior.[11] (Id. ¶ 16.)

Plaintiff argues that defendant's rationale is pretextual because it is contradicted by the evidence. She cites her performance evaluations prior to November 1997, which were generally favorable. She received "overall satisfactory" ratings in annual reviews for each year from 1988 to 1996, with numerous notations that her work quality was superior. (See Pl.'s Resp. Exs. 2A-2I.) However, the reviews also consistently suggest that plaintiff needed improvement in two areas. First, three of the reviews, for 1994, 1995, and 1996, urge plaintiff to improve her ability to work with junior staff members. (See Pl.'s Resp. Exs. 2A, 2B, 2C.) Plaintiff's perceived shortfall in this area is relevant to her promotion, since the job of Public Utility Auditor-Senior

---

[11]At the same time the plaintiff was promoted, the defendant promoted to Public Utility Auditor-Senior a white man in the same division who had worked for the Commission since 1976, and thus was more senior than the plaintiff. (See Def.'s Mem. at 10.) This further supports the conclusion that there was no disparate treatment.

involves leading teams of auditors. (See Def.'s Mem. Ex. G.) Second, a constant refrain of plaintiff's reviews -- echoed in the Kruft affidavit -- is that the plaintiff had difficulty meeting deadlines and needed to work on avoiding procrastination. (See Pl.'s Resp. Exs. 2A, 2B, 2C, 2D, 2H, 2I.) Defendant thus has offered a legitimate, nondiscriminatory reason for plaintiff's failure to be more promptly promoted: the fact that her work performance was uneven and marred by ongoing concerns over her leadership and time management skills.

Plaintiff, in turn, has not offered any evidence beyond her own conclusory allegations that defendant did not promote her earlier because of her race. She therefore has failed to meet her "ultimate burden of persuasion that the legitimate, nondiscriminatory reasons [the employer] proffers . . . are pretexts" for discrimination. Karpel, 134 F.3d at 1229; see also Hawkins v. PepsiCo, Inc., 203 F.3d 274, 280 (4th Cir. 2000), cert. denied, 531 U.S. 875 (2000) (finding that a plaintiff in an employment discrimination case must show that the employer's reasons for taking an employment action were dishonest or pretextual, not just dispute the merits of them). As a result, her disparate treatment claim fails.

B.

Count II of plaintiff's complaint alleges retaliation in violation of Section 704(a) of Title VII, codified at 42 U.S.C. § 2000e-3. A prima facie case of retaliation consists of three elements: "(1) [plaintiff] engaged in a protected activity; (2) the employer took an adverse employment action against her; and (3) a causal connection existed between the protected activity and the asserted adverse action." Von Gunten, 243 F.3d at 863.

Plaintiff focuses her retaliation claim on an alleged "campaign" of retaliatory actions taken against her, stating that she was the subject of "negative performance reviews and

9

evaluations and unwarranted disciplinary actions, i.e., being charged [with] AWOL

improperly."[12]   (Compl. ¶ 20.)  In Von Gunten, the Fourth Circuit recognized that "retaliatory

harassment can constitute adverse employment action, . . . but only if such harassment adversely

affects the 'terms, conditions, or benefits of [the plaintiff's] employment." 243 F.3d at 869-70.

If the claim is cast as one of a hostile work environment in retaliation for a protected action, the

plaintiff also must demonstrate that the harassment was both objectively and subjectively severe

and pervasive. Id. at 870.

    As was discussed in section II.A.1, none of the formal disciplinary actions initiated

against plaintiff constitute adverse employment actions because all were either recommendations

that were never implemented or were actions reversed or rescinded after administrative reviews.[13]

Plaintiff's remaining allegations appear, from her deposition and response to this motion, to

---

[12]Plaintiff asserted in her deposition, although not in Count II or her opposition to this motion, that she was "forced" to transfer to the Telecommunications Division. (Spriggs Dep. at 116.)  To the extent plaintiff is claiming retaliatory transfer, this claim also fails.  First, plaintiff has not identified any materially adverse consequence she faced as a result of the transfer.  She was not demoted, and she received a cost of living adjustment and a salary increase after her transfer.  (See Def.'s Mem. Ex. R; Def.'s Reply Ex. A Attach. 1.)  Plaintiff stated in her deposition that the transfer was unwelcome because "the director [of the Telecommunications Division] had been charged with harassment" (id. at 116-17), but she presented no credible, non-hearsay evidence on this point.  In similar circumstances, courts have not found transfers to constitute adverse employment actions.  See, e.g., Boone v. Goldin, 178 F.3d 253, 256 (4th Cir. 1999) (explaining that "reassignment can only form the basis of a valid Title VII claim if the plaintiff can show that the reassignment had some significant detrimental effect on her").  Second, even if Plaintiff had made out a prima facie case of retaliatory transfer, the defendant has offered a legitimate, non-discriminatory reason for her transfer: that plaintiff herself had sought a transfer and that this assignment best matched her skills and its business needs.  (See Def.'s Mem. Ex. R.)  Plaintiff has offered no evidence to indicate that this reason is a pretext for race or sex discrimination.

[13]The analysis of adverse employment actions is the same for both disparate treatment and retaliation claims.  See Von Gunten, 243 F.3d at 863 n.1.

include two performance reviews she received in June and November 1999 and a May 1999 charge that she was absent without leave for several days. They are discussed in turn below.

The first performance evaluation of which plaintiff complains covered the period from October 1998 to June 1999. The plaintiff's job performance was rated as "meets standards."[14] (See Pl.'s Resp. Ex. 4.) A performance review that is merely average or indicative of good performance and that has been shown to have had no adverse effect on the employee – in this case, the plaintiff received a salary increase only two weeks after the evaluation (see Def.'s Reply Ex. A Attach. 1) – could not be found by a reasonable jury to constitute an adverse employment action.

In the second evaluation, covering May 1999 to October 1999, plaintiff's performance was rated as "needs improvement." (See Pl.'s Resp. Ex. 5.) The defendant voluntarily rescinded this evaluation, along with an accompanying probationary period during which plaintiff was to improve her performance, after the defendant transferred plaintiff to the Telecommunications Division. (See Def.'s Mem. Ex. P.) It also notified her that the negative review could not be used against her in her new assignment. (See id.) Because the defendant took corrective action in withdrawing this performance appraisal, and because plaintiff has not demonstrated any way in which it adversely affected her employment prior to its retraction, the appraisal does not constitute an adverse employment action.[15] See Dennis, 55 F.3d at 156.

---

[14]This rating is defined as being appropriate for employees who "[m]et the requirements and expected results for the job" and exhibited "[g]ood performance which is expected of a fully experienced and competent employee." (Pl.'s Resp. Ex. 4.)

[15]Plaintiff also alleges that it was harassment that the manager who completed both evaluations discussed above, David L. Valcarenghi, indicated – falsely, plaintiff claims – that

Plaintiff also alleges that on one occasion, a manager charged her as having been absent without leave (AWOL) when in fact she had called in sick. (See Spriggs Dep. at 92-97.) Plaintiff indicates that the AWOL charge carried adverse employment consequences for her because, thereafter, she was required to adhere to a "one-day sick slip" procedure. (See id. at 95.) However, she admits that she does not know whether she ever had to follow the procedure. (See id. at 96.) Defendant, meanwhile, proffers evidence indicating that while plaintiff was "counseled" for failing to notify her managers of her whereabouts during three days in May 1999, the recommended one-day sick slip requirement was rescinded before it was ever implemented. (See Valcarenghi Aff. ¶¶ 5, 6.) Because plaintiff has not demonstrated that the AWOL charge carried negative consequences for her, it does not constitute an adverse employment action.[16]

---

plaintiff refused to sign the evaluations. (See Spriggs Dep. at 97-98.) However, plaintiff clearly saw the documents, since she wrote comments on them indicating she did not believe they accurately reflected her contributions and work product. (See Pl.'s Resp. Exs. 4, 5.) Plaintiff has not suggested any way in which a term, condition, or benefit of her employment was affected by the allegedly false notation that she refused to sign evaluations which she challenged and one of which was later retracted.

[16]Plaintiff also asserts a laundry list of other allegations – whether they are part of Count I or Count II is not clear – but none of them affected a term, condition, or benefit of her employment. These include plaintiff's unsubstantiated allegation that her workload increased after she filed the first MCHR complaint (see Spriggs Dep. at 84-91); her allegation that managers failed to give her a written copy of a "counseling memo" in which they critiqued her performance (see id. at 103-06); her allegation that a manager criticized her for acting inappropriately during a meeting (see id. at 121); and her allegation that her photograph was placed at a security desk after her resignation (see id. at 125). Plaintiff also alleges that she heard jokes or comments of a sexual nature on two occasions (see id.), but the incidents appear to have been isolated and not directed at the plaintiff. (See Def.'s Reply Ex. B.)

Likewise, plaintiff's allegations of a retaliatory campaign against her do not demonstrate a work environment that a reasonable person would find hostile. Setting aside those actions which the Commission rescinded, reversed, or never implemented, plaintiff is left only with an average performance evaluation and numerous alleged slights and unpleasantries. This does not amount to severe and pervasive harassment. Further, the plaintiff has not demonstrated that any of the actions of which she complains were motivated by racial or sexual bias or retaliatory animus. This, at base, is fatal to her claims, for, as the Fourth Circuit has stated, "Law does not blindly ascribe to race all personal conflicts between individuals of different races . . . . Instead, legally sufficient evidence is required to transform an ordinary conflict . . . into an actionable claim of discrimination." Hawkins, 203 F.3d at 282.

Even if plaintiff had demonstrated an adverse employment action taken against her in retaliation for her first MCHR complaint, she has not proven the third element of her prima facie case: causal connection between an adverse employment action and the protected activity. Plaintiff filed her complaint on March 31, 1998. (See Def.'s Mem. Ex. B.) While causation in retaliation cases can be based on temporal proximity between the protected activity and the adverse action, see Tinsley v. First Union Bank, 155 F.3d 435, 443 (4th Cir. 1998), all of the disciplinary actions and negative reviews which it is possible, on this record,[17] to date with any

_____

[17]Plaintiff asserts that she was "subjected to harassment and retaliatory treatment" from December 1996 through October 1998. (Pl.'s Resp. at 11.) However, she does not cite any evidence to support this assertion, making it impossible to credit. See, e.g., Causey v. Balog, 929 F.Supp. 900, 910 (D. Md. 1996), aff'd 162 F.3d 795 (4th Cir. 1998) (explaining that a non-movant "'is required to identify specific evidence in the record, and to articulate the "precise manner" in which that evidence supported their claim'") (quoting ContiCommodity Servs., Inc. v. Ragan, 63 F.3d 438, 441 (5th Cir. 1995)).

specificity occurred more than a year after plaintiff filed her first discrimination complaint and prior to her filing of her second complaint. The AWOL charge made by Valcarenghi dates to May 1999, roughly a month after he became acting director of the division (see Valcarenghi Aff. ¶¶ 4-5) and approximately 14 months after plaintiff filed her charge. The other disciplinary recommendations discussed in section II.A.1 were made by Allen in November 1999, about two months after he became the director of the division (see Allen Aff. ¶ 2) and more than one and a half years after plaintiff's first complaint. Similarly, the performance reviews that plaintiff cites were given to her in June and November of 1999. Temporal proximity, and thus causation, is therefore lacking from plaintiff's retaliation claim. See, e.g., Chika v. Planning Research Corp., 179 F. Supp.2d 575, 587 (D. Md. 2002) (finding no causal link where potentially adverse action occurred 18 months after the plaintiff filed a discrimination complaint).

Because plaintiff has failed to establish the second and third elements of a prima facie case of retaliation, Count II will be dismissed.

III.

The Commission argues that it is entitled to summary judgment on plaintiff's § 1981 claims, which parallel the claims she made under Title VII. The same elements of a prima facie case are required for § 1981 as for Title VII. See Gairola v. Virginia Dep't of Gen. Servs., 753 F.2d 1281, 1285 (4th Cir. 1985). Because I have granted defendant's motion as to plaintiff's Title VII claims, I will grant defendant's motion as to plaintiff's § 1981 claims as well.

Date: _April 17, 2002_

_J. Frederick Motz_
United States District Judge